The CINCINNATI GAS & ELECTRIC CO., Petitioner,

v.

Douglas M. COSTLE, Administrator of The United States Environmental Protection Agency, and United States Environmental Protection Agency, Respondents.

Nos. 78–3200, 78–3646.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 5, 1979.

Decided Oct. 16, 1980.

J. Jeffrey McNealey, Porter, Wright, Morris & Arthur, Columbus, Ohio, for petitioner in both cases.

William J. Moran, General Counsel, Daniel W. Kemp, Cincinnati, Ohio, for The Cincinnati Gas & Elec. Co., in No. 78–3200.

Ronald C. Hausmann, Environmental Protection Agency, Washington, D. C., for respondents in both cases.

Paul M. Kaplow, Pollution Control Section, Land & Natural Resources Div., U. S. Dept. of Justice, Washington, D. C., Mary Ann Muirhead, EPA–Region V, Chicago, Ill., for respondents in No. 78–3200.

Pollution Control Section, Land & Natural Resources Division, U. S. Dept. of Justice, Washington, D. C., Environmental Protection Agency, Region V, Chicago, Ill., for respondents in No. 78–3646.

Before EDWARDS, Chief Judge, and PHILLIPS and PECK, Senior Circuit Judges.

HARRY PHILLIPS, Senior Circuit Judge.

This is a companion case to *Republic Steel Corporation, et al. v. Costle*, 621 F.2d 797 (6th Cir. 1980).

The Cincinnati Gas & Electric Company (CG&E) has filed a petition for review pursuant to Section 307(b)(1) of the Clean Air Act, 42 U.S.C. § 7607(b)(1) for review of the final action of the Administrator of the United States Environmental Protection Agency in promulgating the attainment/nonattainment status of Clermont County, Ohio, in relation to national ambient air quality standards for particulates and sulfur dioxide. We affirm the Administrator, dismiss the petition and remand.

I

Section 107(d) of the Clean Air Act [the Act], 42 U.S.C. § 7407(d), as amended in 1977, directs each state to submit to the United States Environmental Protection Agency Administrator [USEPA or Administrator], a list identifying the regions within the state and their national ambient air quality standard [NAAQS]. With respect to the two pollutants in question in this appeal, total suspended particulates [TSP] and sulfur dioxide [$SO_2$], each region must be placed in one of four categories: 1. not meeting the primary NAAQS; 2. not meeting the secondary NAAQS; 3. unclassifiable; or, 4. attainment. 42 U.S.C. § 7407(d).

Pursuant to the 1977 amendments to the Act, Congress is seeking to provide for the attainment of ambient air quality standards by December 31, 1982. 42 U.S.C. § 7502(a)(1). If attainment is not reached by that time, no new construction or modification of major pollution sources will be permitted within the noncomplying regions. 42 U.S.C. § 7502(a)(1). The state implementation plans which are designed to ensure attainment under the Act are also required to detail permit requirements which "require, in the interim (pre December 21, 1982), reasonable further progress . . . including such reduction in emissions from existing sources in the area as may be obtained through the adoption, at a minimum, or reasonable available control technology." 42 U.S.C. § 7502(b)(3). Permits to construct may be issued if the permitting agency determines that the total allowable emissions from existing, new or modified,

and proposed sources "will be sufficiently less than total emissions from existing sources allowed under the applicable implementation plan prior to the application for such permit to construct or modify so as to represent . . . reasonable further progress." 42 U.S.C. § 7503. Petitioner and other Ohio industries are concerned with the Act's effect on industrial growth in Ohio and on industries currently in operation.

The USEPA attainment status designations were promulgated on March 3, 1978. The comment period provided for prior to publication was dispensed with but a post-promulgation comment period was employed.[1] Petitioner filed a timely petition for review. The respondents twice successfully petitioned this court to stay the proceedings. Amendments to the March 1978 final rulemaking were adopted on October 5, 1978. On December 4, 1978, CG&E filed a petition for review of the amended designations to be consolidated with its previous petition.

## II

The present controversy arose when the Administrator replaced the State of Ohio's designation of Clermont County as an attainment area for the NAAQS for both $SO_2$ and TSP by designating Pierce Township, Clermont County, as nonattainment for the primary $SO_2$ NAAQS and the secondary TSP NAAQS.

The Administrator's rulemaking concerning the $SO_2$ designation was based on theoretical modeling which was used to establish $SO_2$ emission limitations for various sources. Aspects of those computer models were challenged in this court on petitions for review in *Cleveland Electric & Illumi-*

*nating Co. v. EPA*, 572 F.2d 1150 (6th Cir.), *cert. denied*, 439 U.S. 910, 99 S.Ct. 278, 58 L.Ed.2d 256 (1978), and *Cincinnati Gas & Electric Co. v. EPA*, 578 F.2d 660 (6th Cir. 1978), *cert. denied*, 439 U.S. 1114, 99 S.Ct. 1017, 59 L.Ed.2d 72 (1979). It is CG&E's general argument that "the models used by the USEPA were not designed or intended to correspond to actual ambient air quality conditions and therefore cannot serve as a rational basis for promulgation of attainment status regulations." It is further alleged that the USEPA failed to consider actual monitoring data which shows that the air quality in Clermont County meets the NAAQS for $SO_2$. Subsequent to oral argument in this cause, the USEPA redesignated Clermont County as attainment for TSP except for a small area surrounding the only monitor which registered violations.[2] Therefore, we shall confine our analysis solely to the $SO_2$ related issues.

## III

CG&E operates a coal–fired electric generating plant, the W.C. Beckjord Power Station, located in the southwest corner of Pierce Township in Clermont County. The station emits suspended particulates (TSP) and $SO_2$. The latter is a by–product of burning high sulfur coal.

In May 1975, CG&E put into operation an air quality monitoring system downward from the station, developed by a meterological consulting firm engaged by CG&E. Two $SO_2$ monitors were placed at the downwind sites determined on the basis of computer diffusion modeling analysis to represent "hot spots" or points of maximum $SO_2$ concentrations. CG&E contends that the monitoring network has demonstrated

1. The failure to provide for a prior comment period was challenged by numerous Ohio industries. This court upheld the action of the Administrator in *Republic Steel Corp., et al. v. EPA, supra*, 621 F.2d at 803–05.

2. During oral argument of this case, the court requested that the USEPA submit a status report within sixty days of the Agency's on–going discussions with Cincinnati Gas & Electric Company on the nonattainment designation of Clermont County, Ohio.

In its status report submitted on February 4, 1980, the USEPA stated that within 45 days it would propose to revise the Clermont County designation limiting the area of secondary nonattainment for TSP to an area surrounding the only monitor which registered violations. The revision will place the W.C. Beckjord facility in a TSP attainment area. Therefore, it is unnecessary that we make a decision with respect to petitioner's arguments on this aspect of the case.

attainment of the NAAQS for $SO_2$ during its three years in operation.

In December 1977, the State of Ohio submitted to the Administrator its list of the attainment status for all regions in Ohio. Clermont County was designated as attainment for $SO_2$ on the basis of the monitoring data. The March 1978 USEPA promulgation replaced Ohio's attainment designation for Clermont County by designating it, as a whole, nonattainment for primary $SO_2$ NAAQS. 43 F.R. at 9022, 9025. The $SO_2$ nonattainment designation was based on diffusion modeling output produced by USEPA for the $SO_2$ plan. That plan involved the use of USEPA's MAXT–24 model, discussed in *Cincinnati Gas & Electric Co., supra.* In October 1978, the USEPA modified its attainment/nonattainment designations, confining the $SO_2$ nonattainment designation for Clermont County to Pierce Township. 43 F.R. 46011, 46014; 40 C.F.R. 81.336 (1978).

### IV

Petitioner raises three general $SO_2$ related arguments in its brief: (1) The USEPA acted arbitrarily and capriciously in ignoring actual $SO_2$ monitoring in Clermont County and in designating a portion of the county as $SO_2$ nonattainment based on modeling studies because (a) monitoring constitutes better evidence, (b) agency practice prefers monitoring, and (c) agency policy is to accept $SO_2$ designations submitted by the states; (2) the USEPA wrongly based its $SO_2$ nonattainment designation for Clermont County on hypothetical future circumstances rather than on actual air quality as of August 7, 1977; and (3) even if the use of theoretical modeling was appropriate, the Administrator's use of the results should have been limited to designating Pierce Township, Clermont County, as an unclassifiable area for the $SO_2$ NAAQS.

In the words of the petitioner: "This case involves questions as to whether the Administrator, in promulgating ... $SO_2$ nonattainment designations for portions of Clermont County, Ohio, ... based such designations on criteria in conflict with those prescribed by statute, acted in direct conflict with those prescribed by statute, acted in direct conflict with established agency policy, based his actions upon unsupportable data and methodology and promulgated nonattainment designations that are arbitrary and capricious and an abuse of discretion."

In considering this petition for review, we may reverse only if the action of the Administrator is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).[3] However, attainment/nonattainment designations are not among the enumerated agency actions "to which this subsection applies." Accordingly, in considering the petition in the present case, we apply 5 U.S.C. § 706(2)(A). *Republic Steel Corporation v. Costle, supra,* 621 F.2d 797 (6th Cir. 1980).[4]

---

**3.** 5 U.S.C. § 706 provides:

**Scope of review**

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

42 U.S.C. § 7607(d)(9) provides:

(9) In the case of review of any action of the Administrator to which this subsection applies, the court may reverse any such action found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or

(D) without observance of procedure required by law, if (i) *such failure* to observe such procedure *is arbitrary or capricious,* (ii) the requirement of paragraph (7)(B) has been met, and (iii) the condition of the last sentence of paragraph (8) is met. (Emphasis added.)

**4.** See also *U.S. Steel Corp. v. USEPA,* 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980), (dissenting opinion from denial of certiorari).

**18**

## V

■ We first look to the USEPA's use of theoretical modeling studies in designating $SO_2$ attainment/nonattainment areas. It is petitioner's initial contention that monitoring is better evidence of actual $SO_2$ air quality than is the theoretical MAXT–24 model predictions relied upon by the agency. Petitioner also contends that the MAXT–24 has a systematic bias causing overprediction because it employs unrealistic "worst case" input assumptions rather than actual operating conditions and it employs an arbitrary terrain adjustment feature.

The parties do not contend that computer modeling techniques correspond exactly to actual ambient air conditions. That is not the issue. Congress, at 42 U.S.C. § 7501(2), has explicitly authorized the use of modeling techniques in classifying areas as attainment/nonattainment:

> (2) The term "nonattainment area" means, for any air pollutant an area which is shown by monitored data or which is calculated by air quality modeling (or other methods determined by the Administrator to be reliable) to exceed any national ambient air quality standard for such pollutant. Such term includes any area identified under subparagraphs (A) through (C) of section 7407(d)(1) of this title.

The use of the MAXT–24 model was expressly approved by this court in *Cincinnati Gas & Electric Co., supra*, 578 F.2d at 661–62, wherein we stated:

> The MAXT–24 model (Second Maximum 24–Hour Dispersion Model with Terrain Adjustments) is designed for use in predicting $SO_2$ pollution resulting from single sources located in rural areas. Unlike the RAM model employed in urban areas, which we dealt with in *Cleveland Electric Illuminating Co., supra*, MAXT–24 does not provide estimates of comparative contributions to total $SO_2$ pollution from a number of point sources. The MAXT–24 model treats each point source as an isolated problem, and only general background $SO_2$ pollution data are added into the formula.

In other respects the MAXT–24 model strongly resembles the RAM model. Thus, like RAM, MAXT–24 starts with a solid ascertainable data base, namely, the established design capacity of the power or steam generating plants in question related to the sulfur content of the fuel used by such plants. Emissions data are developed from these factors. Subsequently, stack height, wind, weather, and terrain data are added. Like RAM, MAXT–24 employs a Gaussian plume formula and assumes vertical and horizontal dispersion of the pollution plume. It employs the Pasquill–Gifford stability classifications and coefficients.

Like RAM, the MAXT–24 model was designed by United States EPA largely as a result of industry criticism of the use of rollback modeling. As was true in relation to the RAM results, the results of use of MAXT–24 were generally less strict than those contemplated by the 1972 and 1974 Ohio EPA $SO_2$ regulations.

Indeed, the comments this court made in Section 3 of the opinion in *Cleveland Electric Illuminating Co., supra*, are largely applicable to EPA's adoption of MAXT–24 and we cite and rely on said Section 3 in holding that in general (and with one exception noted below) the EPA's adoption and use of the MAXT–24 model is not arbitrary or capricious and, like the use of the RAM model, must be affirmed by this court.

Despite the discussion above, we are not certain that any of the petitions we deal with in this opinion seriously disputes the general validity of the MAXT–24 model. What these petitioners clearly do contend is that the MAXT–24 model results are badly skewed to their great economic disadvantage by 1) the Class A assumption employed to estimate pollution dispersion in the least stable wind condition, and 2) the failure of EPA to employ the half ground displacement theory in estimating pollution impact on hilly terrain. (footnote omitted.)

The "one exception noted below" refers to the USEPA's employment of the Class A assumption in determining pollution dispersion under "least stable" wind conditions in rural areas and areas of complex terrain, which we held to be arbitrary and capricious. 578 F.2d at 663–64.

Petitioner's allegation that the MAXT–24 model employed an arbitrary terrain adjustment feature which permitted hillside receptors to receive the full impact of the center of the plume has not been briefed, argued or documented. In fact, this court has ruled on the MAXT–24 terrain adjustment feature in *Cincinnati Gas & Electric Co., supra,* 578 F.2d at 664–65. Petitioner has not shown this court any distinction between its argument in that case and the allegations in the present case. It is clear here, as Chief Judge Edwards noted in *Republic Steel Corp., et al. v. EPA, supra,* 621 F.2d at 805, "this argument [is] a thinly disguised, belated motion for rehearing" and accordingly, we reject it. *See Cincinnati Gas & Electric Co., supra; Cleveland Electric Illuminating Co. v. EPA,* 572 F.2d 1150 (6th Cir. 1978).

Petitioner also argues that the agency deviated from its policy of accepting monitoring data over modeling results when the two conflict. At 43 F.R. 45998, the USEPA responded to objections to its use of modeling results:

> The Agency has determined that where air quality modeling results are available, such results will be used to determine the designation, *taking precedence over air quality monitoring data* which is usually not sufficiently comprehensive to cover any given area. Therefore, EPA designated most of the $SO_2$ nonattainment areas in Ohio based upon its modeling analysis. (Emphasis added.)

Petitioner contends that this policy contradicts the guidance given to the Air Branch Chiefs of the regional offices which states: "If there is a conflict between *adequate* monitoring data and modeling results, monitoring values should be used."

CG&E asserts that its two $SO_2$ monitors operated continuously and were carefully located on the basis of diffusion modeling predictions to catch "hotspots".

■ The bare allegation that CG&E's monitoring system was created by a meteorological consulting firm and put in place based on computer diffusion modeling calculated to locate true "hotspots" is insufficient to establish that the monitoring data is "adequate" in the sense that it should prevail over the modeling results. As we noted in *Cleveland Electric Illuminating Co., supra,* petitioners there refused to provide the USEPA with their Environplan model and refused the operative details to the agency based on a proprietary interest. In light of CG&E's bare allegation that the monitors are "adequate" indicators of $SO_2$ pollution at designated "hotspots", we hold that it has failed to establish that the USEPA acted arbitrarily and capriciously in electing to abide by the MAXT–24 results as permitted in 42 U.S.C. § 7501(2).

■ Likewise, the USEPA's failure to accept the State of Ohio's $SO_2$ designations contrary to its alleged policy cannot be said to constitute arbitrary and capricious action on its part. *Cleveland Electric Illuminating Co., supra; Republic Steel Corp., supra.* There is no statutory requirement that the USEPA accept state recommendations. Petitioner has not cited us to any authority to support its contention. We find this argument to be without merit.

## VI

CG&E next contends that the USEPA wrongly based its $SO_2$ designation for Clermont County on hypothetical future circumstances rather than on actual air quality as of August 7, 1977.

■ Petitioner argues that the USEPA, in basing its $SO_2$ nonattainment designation on improbable or impossible hypothetical future circumstances, violated 42 U.S.C. § 7407(d)(1), which provides as follows:

### List of noncomplying regions

(d)(1) For the purpose of transportation control planning, part D of this sub-

chapter (relating to nonattainment), part C of this subchapter (relating to prevention of significant deterioration of air quality), and for other purposes, each State, within one hundred and twenty days after August 7, 1977, shall submit to the Administrator a list, together with a summary of the available information, identifying those air quality control regions, or portions thereof, established pursuant to this section in such State which on August 7, 1977–

(A) do not meet a national primary ambient air quality standard for any air pollutant other than sulfur dioxide or particulate matter;

(B) do not meet, or in the judgment of the State may not in the time period required by an applicable implementation plan attain or maintain, any national primary ambient air quality standard for sulfur dioxide or particulate matter;

(C) do not meet a national secondary ambient air quality standard;

(D) cannot be classified under subparagraph (B) or (C) of this paragraph on the basis of available information, for ambient air quality levels for sulfur oxides or particulate matter; or

(E) have ambient air quality levels better than any national primary or secondary air quality standard other than for sulfur dioxide or particulate matter, or for which there is not sufficient data to be classified under subparagraph (A) or (C) of this paragraph.

August 7, 1977, is the effective date of the Clean Air Act as amended. Congress demonstrated concern with post August 7, 1977, air quality. The statement in the Act, that the states shall submit to the Administrator a list identifying air quality control regions which "on the date of enactment . . . .", is equivalent to requiring a list as of that date of areas which fall into one of the mentioned categories. 42 U.S.C. § 7407(d)(1) specifically states: "For the purpose of transportation control planning, part D (relating to nonattainment), part C (relating to prevention of significant deterioration of air quality) and for other pur-

poses . . . ." The purpose of measuring the air quality at the initiation of the Act is to provide for an effective means to design a plan to curb future pollution. Future growth is an essential element of a plan of this type. Foresight is the key to planning. We would also note that the USEPA's Supplemental Technical Support Document of May 1977, the Sulfur Dioxide Control Strategy for the State of Ohio, states that, "[a]s required by § 110(a)(2) of the Act, the pollution control strategy implemented by the regulation is designed to assure both attainment and *maintenance* of the national ambient air quality standards. In keeping with the obligation to ensure that the standards are maintained, the control strategies in the regulation designed to meet the annual standard for $SO_2$ include consideration of industrial growth for each geographical area analyzed." (Emphasis added.) *Id.*, at 68. Petitioner has failed to establish that the future growth considerations were used to establish the designation rather than to formulate the plan for curbing future pollution; nor has it established that these are two distinct procedures. Further, petitioner failed to raise this objection in its attack on the MAXT–24 model in *Cincinnati Gas & Electric Co., supra,* 578 F.2d 660 (6th Cir. 1978), *cert. denied,* 439 U.S. 1114, 99 S.Ct. 1017, 59 L.Ed.2d 72 (1979).

### VII

■ We find no merit in the contention of the petitioner that Pierce Township should have been designated as unclassifiable. As noted above, the validity of the MAXT–24 model has been settled by this court. Petitioner has not seen fit to explain to this court the significance of "a factor of two" nor otherwise discredit the MAXT–24, both of which could have been raised in *Cincinnati Gas & Electric Co., supra.* Petitioner has failed to establish that the Administrator acted in a capricious or arbitrary manner.

### VIII

Upon a thorough review of the record and attendant documents and the argu-

ments of counsel as presented in their briefs and oral argument, it is evident to the court that this case is in fact a "thinly disguised, belated motion for rehearing."

It results that the petition for review is hereby dismissed. This matter is remanded to the USEPA for the action necessary to implement the designation revisions as propounded to this court in its letter and affidavit of February 4, 1980. No costs are taxed. Each party will bear its own costs in this court.